Filed 8/27/18 order modifying
opinion filed 7/31/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>JAMES SAMUEL BILBREY,<br><br>Defendant and Respondent. | A150273 & A151401<br><br>(Solano County<br>Super. Ct. Nos. FCR300980 &<br>VCR198866)<br><br>**ORDER MODIFYING OPINION<br>[CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the partially published opinion filed herein on July 31, 2018, be modified as follows:

On page 2, the third paragraph, beginning with "We affirm" is modified as follows:

We affirm **in part and reverse in part** both the order granting Bilbrey's petition for writ of habeas corpus and the order dismissing the case based on the violation of Bilbrey's right to a speedy trial.

At the top of page 30, replace the first partial paragraph beginning "required specific intent," with the following:

**required specific intent to maim or kill, the jury could have found Bilbrey not guilty of aggravated mayhem and/or attempted murder. Then, rather than the**

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Background parts I and II, and Discussion part I.

lengthy sentences imposed on those offenses—life with the possibility of parole and 11 years, respectively, for aggravated mayhem and attempted murder—Bilbrey's punishment for convictions under any lesser included charges would have included substantially less prison time.

On page 30, after the first full paragraph, insert the following:

The scope of the trial court's order granting relief, however, was overbroad. The jury trial resulted in Bilbrey being convicted of four crimes, two requiring specific intent and two requiring only general intent. Attempted murder and aggravated mayhem are specific intent crimes. (*People v. Smith* (2005) 37 Cal.4th 733, 739 [conviction for attempted murder requires proof of specific intent to kill]; *People v. James* (2015) 238 Cal.App.4th 794, 811 [conviction for aggravated mayhem requires proof of specific intent to cause a permanent disability or disfigurement].) Assault with a deadly weapon and battery with serious bodily injury are general intent crimes. (*People v. Perez* (2018) 4 Cal.5th 1055, 1066 [assault with a deadly weapon is a general intent crime]; *People v. Lara* (1996) 44 Cal.App.4th 102, 108 [battery with serious bodily injury is a general intent crime].)

Mental state defenses such as those defense counsel was ineffective for failing to investigate apply only to crimes requiring specific intent. (Pen. Code, § 28.) Therefore, Bilbrey was prejudiced, and entitled to a new trial, as to only his convictions requiring specific intent: attempted murder and aggravated mayhem. Mental state defenses do not apply to crimes requiring only general intent. (*People v. Bejarano* (2009) 180 Cal.App.4th 583, 589.) Accordingly, Bilbrey was not entitled to a new trial on his convictions for assault with a deadly weapon and battery with serious bodily injury.

For this reason, we affirm the trial court's habeas order as to its grant of a new trial on Bilbrey's conviction for attempted murder. It makes no difference that attempted voluntary manslaughter is a lesser included offense of attempted murder, because that offense also requires a specific intent to kill. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1545.) As such, trial counsel's deficient performance would have prejudiced Bilbrey even if he had been found guilty of, or even if we reduced the attempted murder charge to attempted involuntary manslaughter. Bilbrey was thus entitled to a new trial on the attempted murder conviction.

Bilbrey's conviction for aggravated mayhem is somewhat different. An appellate court may reduce a conviction to a lesser included offense if the evidence supports the lesser included offense. (§ 1260; *People v. Howard* (2002) 100 Cal.App.4th 94, 99.) General mayhem is a lesser included offense of aggravated mayhem. (*People v. Robinson* (2014) 232 Cal.App.4th 69, 75.) The People note the jury was instructed on general mayhem as a lesser included offense of aggravated mayhem, and the jury form reflected that option. ~(AOB 45-46)~ Rather than granting on new trial on this issue, the trial court should have reduced Bilbrey's conviction for aggravated mayhem to one for general mayhem. General mayhem

2

requires proof of only general intent. (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1226.)  Bilbrey would not have been prejudiced by trial counsel's deficient performance as to a conviction on that charge and was not entitled to a new trial on it.

Our reduction of Bilbrey's aggravated mayhem conviction to one for general mayhem has another consequence.  At sentencing, the trial court dismissed Bilbrey's conviction for battery with great bodily injury as a lesser included offense of aggravated mayhem. ~(A150273 - Ex. W at p. 1099)~ However, battery with great bodily injury is not a lesser included offense of general mayhem. (*People v. Poisson* (2016) 246 Cal.App.4th 121, 125.)  As such, dismissal of the battery count as a lesser included offense was not required.  (See *People v. Sanders* (2012) 55 Cal.4th 731, 736 [describing rule prohibiting multiple convictions based on necessarily lesser included offenses].)  Accordingly, Bilbrey's convictions for both general mayhem and battery with serious bodily injury may stand.

For these reasons, we affirm the trial court's habeas order as to Bilbrey's conviction for attempted murder.  We reduce Bilbrey's conviction for aggravated mayhem to one for general mayhem.  We reverse the habeas order as to Bilbrey's convictions for general mayhem and assault with a deadly weapon.  We also reverse the habeas order as to Bilbrey's conviction for battery with great bodily injury, which is reinstated.

On page 31, add the following sentence to the end of the first full paragraph which begins with "The parties do not dispute":

Because part I of our Discussion concluded that Bilbrey was entitled to a new trial only on his attempted murder conviction, our analysis in this part is necessarily limited to whether dismissal of that count was lawful.

On page 45, delete the second full paragraph, beginning with "In short," and replace with the following to end:

In short, we conclude that the People have not met their burden to show the trial court abused its discretion in dismissing the attempted murder charge under section 1382.  In part I of the Discussion section, however, we concluded Bilbrey was entitled to a new trial only as to that conviction.  Accordingly, only the attempted murder count warranted dismissal under section 1382, and the trial court erred in dismissing the other charges.

### DISPOSITION

We affirm the November 21, 2016 order granting Bilbrey's petition for writ of habeas corpus only as to Bilbrey's conviction for attempted murder.  We also affirm the March 22, 2017 order granting Bilbrey's motion to dismiss as to that charge.

**We reverse the order granting habeas corpus and the order granting Bilbrey's motion to dismiss as to Bilbrey's convictions for aggravated mayhem, assault with a deadly weapon and battery with great bodily injury. We reduce the conviction for aggravated mayhem under section 205 to one for general mayhem under section 203 and reinstate Bilbrey's convictions for assault with a deadly weapon and battery with great bodily injury. We remand to the trial court for resentencing on those counts.**

**Our May 2, 2017 stay of the dismissal order will dissolve upon issuance of the remittitur.**

This modification changes the judgment.  The petition for rehearing is denied.

Dated: _____            _____

Kline, P.J.

Trial Court:   Solano County Superior Court

Trial Judges:  Hon. Paul L. Beeman, Hon. Allan P. Carter

Counsel:

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Laurence K. Sullivan, Supervising Deputy Attorney General, Michael Chamberlain, Bridget Billeter, Deputy Attorneys General, for Plaintiff and Appellant.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Respondent.

Filed 7/31/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>JAMES SAMUEL BILBREY,<br><br>     Defendant and Respondent. | A150273 & A151401<br><br>(Solano County<br>Super. Ct. Nos. FCR300980 &<br>VCR198866) |

A jury found James Samuel Bilbrey guilty of attempted murder (Pen. Code,[1] §§ 187/664), aggravated mayhem (§ 205), assault with a deadly weapon (§ 245, subd. (a)(1)), and battery with serious bodily injury (§ 243, subd. (d).) The jury also found true a knife-use enhancement (§ 12022, subd. (b)(1)) and a great-bodily-injury enhancement (§ 12022.7, subd. (a)). The trial court denied Bilbrey's motion for a new trial and sentenced Bilbrey to state prison for an aggregate term of 11 years to life. We affirmed the judgment on direct appeal. (*People v. Bilbrey* (May 14, 2013, A129236) [nonpub. opn.].)

In November 2016, the trial court granted Bilbrey's petition for a writ of habeas corpus, based upon the ineffectiveness of trial counsel, and ordered a new trial. The People filed a timely notice of appeal (A150273).

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Background parts I and II, and Discussion part I.

[1] All further statutory references are to the Penal Code unless otherwise indicated.

After filing the appeal, the People did not seek to set a trial date or bring the case to trial. Nor did they seek a stay of trial court proceedings. In March 2017, Bilbrey filed a motion to dismiss the information for violation of his speedy trial rights under section 1382. The People opposed, arguing their pending appeal in case A150273 deprived the trial court of jurisdiction to rule on that motion. The trial court granted the motion to dismiss on March 22, 2017. The People filed a timely notice of appeal from the order of dismissal (A151401). In response to the People's subsequent petition for writ of mandate, we stayed the dismissal order pending resolution of the People's appeal from the trial court's habeas ruling.

We granted Bilbrey's unopposed motion to expedite the appeal from the habeas ruling and, on our own motion, consolidated that appeal with the People's appeal from the dismissal motion for purposes of oral argument and decision.

We affirm both the order granting Bilbrey's petition for writ of habeas corpus and the order dismissing the case based on the violation of Bilbrey's right to a speedy trial.

## BACKGROUND

### I.

### *The Trial*[2]

#### A. The Prosecution Case

##### 1. *The Argument Outside the Bar*

In the early morning hours of July 13, 2008, David Apple, Michael McDaniel, Melvin Black, and Andrew Buchanan were at the Past Time bar on First Street in Benicia. Apple identified Bilbrey as being in the bar that night, along with a friend of Bilbrey's, David Becchio.[3] Apple heard Bilbrey say to someone, "I'm from Richmond."

---

[2] We derive our summary of the evidence presented at Bilbrey's trial from our unpublished 2013 opinion in Bilbrey's direct appeal, No. A129236. We granted the People's unopposed request for judicial notice of the record in that appeal. From that record and the exhibits filed with the petition for writ of habeas corpus, we have added relevant information where necessary.

[3] The witnesses all described Bilbrey's friend as the taller of the two. It was uncontested during trial, and confirmed by Bilbrey, that Bilbrey's companion was

2

McDaniel also remembered Bilbrey and Becchio being in the bar, noticing them because they were confrontational and stared at people. Buchanan said that inside the bar, Bilbrey seemed upset and rude, talking in a disrespectful manner to people with whom he came in contact.

Around 2:00 a.m., Apple left the bar to make a phone call. While Apple talked on the phone, Bilbrey bumped him from behind. Apple turned around and said, "What's going on? What's your problem?" or "Dude, what the fuck?" Bilbrey responded, "I'm from Richmond." Apple said: "It's not where you're from. It's where you're at." or "The hell with Richmond. We're in Benicia." At this point Apple and Bilbrey squared off, as if to fight. McDaniel, Black, and Buchanan witnessed all or part of this confrontation.

Someone said that Bilbrey had a knife, and McDaniel pulled Apple back. Both Apple and Black saw Bilbrey holding a knife. According to Buchanan, Bilbrey said he had a knife and wanted to fight.

Benicia Police Officer Mark Simonson was on patrol and noticed the men arguing outside the Past Time bar. Simonson drove between the two groups and told them to go their separate ways. He told Bilbrey and Becchio to walk north on First Street, while Apple and his friends walked west on H Street.

Simonson then contacted Bilbrey and Becchio about two blocks up First Street. Bilbrey said there had been an argument at the bar, but there was no problem and they would like Simonson to call a cab for them. Simonson asked police dispatch to have a cab sent, but about 30 seconds later a cab came down First Street. The driver, Ernest Alameda, said he was en route to a fare, but would call and ensure that another cab was coming. Simonson departed.

### 2. *The Fight*

Joseph Tomada and his sister, Rachelle Tomada (Rachelle), were also at the Past Time bar that evening. They left the bar when it closed at 2:00 a.m., and walked down

Becchio. In reciting the facts, we refer to Becchio by name, even when the witnesses were not able to name the companion.

3

First Street intending to go to Rachelle's condominium. As they walked, they heard some people talking and cursing, but did not know where the words were coming from, and did not think the words were directed at them. Tomada heard the voices say they were from Richmond and he yelled out "Faggots," and told whoever it was to go back to Richmond. Tomada and Rachelle then heard people coming up behind them and Rachelle heard someone say, "What the fuck did you call me?" or "What the fuck did you say?" Rachelle turned around and saw Bilbrey, holding a knife in his hand, and Becchio.

Tomada heard Rachelle say, "He has a knife," turned around, and saw Becchio in front of him. Bilbrey was standing to the side with a knife in his hand. Becchio swung at Tomada after saying, "You going to be a little bitch?" Tomada returned the punch, hitting Becchio on the chin. Becchio fell to the ground, got up, and charged Tomada. Tomada hit Becchio in the face and Becchio again fell to the ground.

As Tomada struck Becchio the second time, Bilbrey hit Tomada in the face. Tomada saw a white flash, and everything went black. He backed up, trying to rub his eyes, and felt something go into his mouth. He felt his teeth break and something slide in and cut his tongue. Tomada felt his face and it seemed to him "like a giant razor cut" down the side of his face and he felt his "whole face kind of flap" when he exhaled. He realized he had been cut and he threw a punch at the face of the brown shadowy figure he could perceive in front of him. Bilbrey fell to the ground, and Tomada felt something in his leg that caused him to buckle and fall on top of Bilbrey. Tomada continued punching Bilbrey on the ground, trying to hold down the hand in which Bilbrey held the knife.

Eventually, the struggle on the ground stopped. Someone helped Tomada up and led him to a taxi where he laid across the trunk.

Other prosecution witnesses, including the taxi driver, as well as McDaniel, Black, and Buchanan, corroborated key aspects of the Tomadas' account. These included Bilbrey and Becchio initiating the encounter with the Tomadas by running up to them, Bilbrey's possession of a knife or something "shiny" and that none of the participants in the earlier verbal altercation punched or kicked Bilbrey or Becchio.

4

### 3. *Following the Fight*

Officer Simonson had just returned to the police station after calling a cab for Bilbrey and Becchio when he received a dispatch for a knife brandishing on First Street. He arrived on the scene to find Tomada leaning over the back trunk of a cab, bleeding badly. Becchio was sitting nearby on the curb, and Bilbrey was lying motionless on the sidewalk with several facial injuries.

Tomada and Bilbrey were transported to a hospital. Tomada had a six-centimeter laceration on his cheek, about one to one and one-half centimeters deep, two to three inches from the carotid artery; a through-and-through laceration of the tongue; and a penetrating wound to the floor of his mouth, two to three inches from the jugular vein. Tomada's right eye was split open from front to back. Tomada now has no vision in that eye, which will not recover. Tomada also suffered nerve injury to his left eye and does not have full sight in that eye. According to Tomada, his left eye has 20/80 vision, making him legally blind. He testified that a third of his tongue is hard scar tissue and he can taste nothing but saltiness in that portion of the tongue. He lost halves of two teeth and he has a scar where he was cut on the face.

Bilbrey was diagnosed with a traumatic brain injury and disconjugate gaze, meaning that his eyes were not working in synch. A traumatic brain injury means that the brain has been injured "to make it not function properly." The terms "traumatic brain injury" and "concussion" are interchangeable, as both mean being hit in the head hard enough to either lose consciousness or alter one's thinking. Bilbrey's blood alcohol content was 0.224%.

Officer Kenneth Hart spoke with Bilbrey at the hospital. Bilbrey stated that he had been drinking in the Past Time bar with Becchio and that there had been a non-physical argument with some young men, who had called him a punk. He and Becchio then walked down the street and asked an officer to call them a cab. The officer requested that a cab be sent and left the scene. Bilbrey then said that he and Becchio got into an argument with a man who was walking with a woman. During the argument, the man punched Bilbrey, knocking him down. Bilbrey walked across the street, but when

he turned, he saw Becchio fighting the man. Bilbrey returned and was punched and knocked down again. Bilbrey told Hart that this was all he remembered and that he did not remember who had started the fight.

Bilbrey told Hart that he did not remember if he had a knife and denied brandishing a knife in front of the bar. Bilbrey then admitted that he might have cut Tomada and said, "I think I cut him when I went down the second time." Bilbrey then told Hart that he was swarmed by a group of people who began punching and kicking him. While he was down, he was able to pull the knife out of his pocket, open it, and cut Tomada.

Bilbrey never mentioned being threatened by a group of people when he spoke to Officer Simonson in front of the bar and never mentioned fearing for his life.

## B. The Defense Case

Bilbrey began by testifying that he had a nerve disorder called Charcot-Marie-Tooth (CMT), which causes nerve degeneration and muscle loss. The disorder caused Bilbrey weakness in his hands and legs.

Bilbrey carried a knife for protection because he had been beaten and robbed in the past. On the night of his fight with Tomada, Bilbrey had the knife clipped onto the top of his pants.

Bilbrey testified that he and Becchio went to the Past Time bar around 1:00 a.m. While in the bar, he did not mention Richmond and did not threaten or intimidate anyone. At last call, Bilbrey made a comment to a woman that apparently offended her. When he left the bar a few minutes later, Apple confronted him about the comment, asking, "Why did you disrespect my friend?" McDaniel, standing next to Apple, said: "What the fuck is your problem? Do you want to get fucked up?" Bilbrey said he was sorry if he offended anyone and didn't want any problems. He went back into the bar to get Becchio and when they exited, Apple and McDaniel again confronted and harassed them. They began to walk away and Becchio yelled, "Fuck you, punks." The group in front of the bar then began threatening them and someone yelled, "You better fuckin' keep walking or you are going to get shot." Bilbrey turned and said: "Fuck you, punks. Don't threaten

6

me. I already said I was sorry, and I told you we were leaving." Bilbrey also said that he was from Richmond and was not scared of them.

The men started walking toward Bilbrey, and Bilbrey became scared. He took the knife from his pants, opened it and held it up in the air, saying, "Don't do it. Back off." Bilbrey put the knife back on his pants and he and Becchio turned and started walking up First Street. They sat down on a bench about two blocks up First Street and Bilbrey saw Tomada and Rachelle across the street, arguing and yelling at each other. A police officer pulled up and broke up the argument. Becchio flagged down the officer and asked if he could call a cab for them. The officer told them they would have to get their own cab. Bilbrey told the officer that he was scared because of an argument in front of the bar in which he had been threatened, but the officer told them to keep walking and drove away.

Just before the officer left, Bilbrey and Becchio flagged down a cab. The cab driver said he had a fare in front of them and could not give them a ride. Tomada and Rachelle then crossed the street to the cab, stepped onto the sidewalk near Becchio, and started yelling at them about taking their cab. Bilbrey yelled back that they weren't taking the cab and Tomada punched him on the side of the head. The punch almost knocked Bilbrey out. Bilbrey fell to the ground and saw Tomada coming at him as he got up. Bilbrey felt dizzy. Bilbrey started across the street to get away, but when he turned around, he saw Becchio and Tomada in a wrestling hold. He then heard yelling and screaming from the west side of the street and saw McDaniel, with what looked like a two-foot-long pipe or stick in his hand, accompanied by someone else. McDaniel yelled, "What is up now? You are dead, motherfucker." Bilbrey yelled at them that cops were on the way in order to get them to back off.

Tomada then came in Bilbrey's direction, so Bilbrey put his knife out in front of him and yelled at Tomada to back off. Tomada swung at Bilbrey and Bilbrey struck back with the knife. It felt to Bilbrey that he had contacted Tomada, but he did not see where he hit him. Tomada's punch connected and Bilbrey was knocked to the ground. Bilbrey was not able to get back up and had not intentionally stabbed Tomada in the eye, mouth

or face.  When on the ground, multiple people started punching and kicking him at the same time and he was swinging his hands, still holding the knife.  He was knocked unconscious and woke up at the hospital.  He could not see straight for about a week.

The defense also presented evidence concerning prior incidents of violence by Tomada, in support of Bilbrey's self-defense.  In rebuttal to that evidence, the prosecution introduced evidence of an incident in El Cerrito, four days before the fight between Tomada and Bilbrey.  Reid Ainsworth testified that Bilbrey had brandished his knife and threatened to cut him.[4]

The defense presented no expert testimony on any subject.

In her closing, defense counsel argued to the jury that Bilbrey had acted in self-defense.  Counsel explained self-defense applied to, and negated, each of the crimes with which Bilbrey was charged.  To this end, counsel focused on discrepancies between the varying accounts of the prosecution's witnesses and challenged their credibility.  The court instructed the jury on the elements of self-defense, including the mutual-combat variation and the limitations on contrived self-defense and the right to use force in self-defense only as long as the danger exists or reasonably appears to exist.

Upon defense counsel's request, the court also instructed the jury that it could consider Bilbrey's voluntary intoxication in deciding whether he acted with the specific intent to kill or the specific intent to permanently disable or disfigure Tomada.  Defense counsel argued the intoxication defense briefly, noting that the prosecution was required to show an elevated level of intent for the "serious" crimes of aggravated mayhem and attempted murder.

Counsel's closing argument also briefly referred to Bilbrey's "neurological disease" and muscle weakness in noting the size and strength disparities between Bilbrey and Tomada.  Counsel reminded the jury of Bilbrey's concussion as relevant to both the

---

[4] The discovery of the El Cerrito incident, first provided to the defense midtrial, prompted the trial court to acknowledge prejudice to Bilbrey's defense and offer him a mistrial.  After conferring with Bilbrey, defense counsel declined the offer.

reasonableness of his belief in the need to defend himself and whether he had the specific intent to maim or kill Tomada.

### C. Sentencing

At sentencing, the court dismissed the fourth count (§ 243, subd. (d), battery causing severe bodily injury), along with its enhancements, as a lesser included offense. Using the count of attempted murder as the principal determinate count, the court imposed the midterm of seven years, plus three years for the knife enhancement under section 12022.7, subdivision (a), plus one year for the great-bodily-injury enhancement under section 12022, subdivision (b)(1)—for a total base term of 11 years. On the assault count, the court imposed the midterm and stayed the sentence and enhancements pursuant to section 654. On the count of aggravated mayhem, the court imposed an indeterminate term of life with the possibility of parole, to run concurrently with the determinate term.

## II.

### *The Habeas Proceedings*

In 2013, Bilbrey filed a petition for writ of habeas corpus, claiming he was denied the right to effective assistance of counsel at trial. Bilbrey alleged his trial counsel, Laura Petty, had: (1) failed to consult with an expert witness about the effects of his intoxication, his neurological disorder, and his concussion on his mental and physical state during the fight with Tomada; (2) failed to present a strong and adequately researched defense of self-defense; and (3) improperly rejected the trial court's offer to declare a mistrial upon the disclosure of the damaging El Cerrito rebuttal evidence. The trial court issued orders to show cause and held a six-day evidentiary hearing during which both Bilbrey and the People presented evidence.

9

A.    **Bilbrey's Habeas Case**

1.    *Dr. John Greene's Medical Expert Testimony*

Dr. Greene testified as an expert in forensic psychiatry. Greene's work includes evaluating criminal defendants for mental-state defenses, including mental illness and the effects of alcohol and traumatic brain injury on a person's judgment and function.

Bilbrey's habeas counsel explained the purpose of Greene's testimony was to address "had trial counsel consulted with a forensic psychiatrist . . . would they have been able to present evidence that would be relevant to the defense and that could have resulted in a different outcome." Greene personally evaluated Bilbrey and reviewed the trial record in preparation for his testimony.

a.  **The Effects of Alcohol**

Greene described alcohol as causing "a decrease in overall functioning, a decrease in the judgment and a decrease in perception, decrease in accuracy. As a person drinks more alcohol, his or her "ability to operate with gross motor and fine motor activity decreases." A reduction in gross motor skills affects a person's ability to aim or wield a tool with precision. Alcohol also "lowers one's inhibition and . . . judgment."

Greene noted that the record of Bilbrey's trial indicated his blood alcohol content was "0.2[%] at 3:00 in the morning" and estimated to be "around 0.26[%] at the time of the incident." A person with a blood alcohol level of 0.20% or more generally "has substantial problems in fine motor skills . . . and gross motor skills in judgment and in behavior in general."

Alcohol consumption can also affect short-, intermediate-, and long-term memory. Usually, "short term memory is affected first, then intermediate, then long term." But Greene explained it is possible for a very intoxicated person to "still remember things that went on" and, though "things might be kind of hazy and details might be kind of difficult . . . they will still be able to give some sort of a narrative."

A person with a high alcohol tolerance "is able to regulate in some way their presentation, or the actual physiological response" to alcohol as compared to a person

10

without such tolerance.  Greene's understanding of Bilbrey's high alcohol tolerance came just from speaking with Bilbrey, and he saw no indication that Bilbrey was malingering.

### b.  The Effects of a Traumatic Brain Injury

Based on his review of the trial record, Greene also confirmed Bilbrey had been diagnosed as having sustained a concussion during the incident.

Greene testified about the effects of such traumatic brain injuries (TBI) on a person's perception and coordination.  A TBI can occur when a person is struck in the face or hits their head on a sidewalk.  Depending on its severity, a TBI "can lead one to lose their ability to understand what's going on, their orientation, and their perception of what is happening around them."  It can also affect memory, motor coordination, and social judgment, and those effects can be magnified by acute alcohol intoxication.

### c.  Effects of Charcot-Marie-Tooth Syndrome (CMT)

Greene described CMT as a neurological disorder "where one's peripheral, motor, and sensory neurons are deteriorated in some fashion" leading to "coordination and sensation problems in [one's] hands, arms, legs, feet, et cetera."

Bilbrey informed Greene that he was diagnosed with CMT and the disorder runs in his family.  Bilbrey reported "weakness in his upper and lower extremities [and] difficulty in walking."  Greene opined it was reasonable to conclude that alcohol intoxication would exacerbate the effects of CMT.  Greene explained that such motor impairment can also affect "a person's subjective sense of vulnerability" and their "perception of threat."

His information about Bilbrey's experience with CMT came from Bilbrey and his family, not Bilbrey's medical records.  However, his review of Bilbrey's medical records during trial confirmed the CMT diagnosis.  Greene did not perform a neurological examination of Bilbrey or independently confirm the CMT diagnosis.

### d.  Cumulative Effects of Bilbrey's Conditions on Specific Intent

Ultimately, Greene explained it was reasonable to conclude that a "person with alcohol intoxication of a level above a .20 who has suffered blunt force trauma to the

head and suffers from Charcot-Marie-Tooth syndrome" would experience "significant psychomotor impairment." Greene opined that a person in those circumstances would have difficulty wielding a knife with great dexterity or intentionally inflicting the stab wounds that occurred in this case.

### 2. *Bilbrey's Testimony*

Bilbrey retained defense counsel Laura Petty to represent him in September 2008. His trial occurred in December 2009. Over that span, Bilbrey and Petty met approximately seven or eight times. They never met specifically to discuss his defenses in the case, but they did have one conversation about them. Bilbrey asked Petty, "what is our defense," and she "said it was Joseph Tomada's violent history." Bilbrey understood that to mean Tomada "had other altercations." They did not discuss self-defense or its elements. Bilbrey made no suggestions or demands about his trial defense, and Petty did not ask. Bilbrey informed Petty that he was intoxicated on the night of the incident. He gave Petty permission to review his medical records, which he assumed she did.

He also told her he had been struck in the head during the fight. Bilbrey believed Petty knew about his concussion based upon her review of his medical records. They also discussed the order of events during the fight, with Bilbrey telling her that "Joseph Tomada struck me in the head before I used the weapon." Specifically, he told her, "once he hit me, I fell to the ground, hit the back of my head on the concrete, and I tried to get back up. Well, I did get back up, but I was stunned. I was really dizzy." He also told her he felt like he was going to "pass out."

Bilbrey informed Petty of his CMT diagnosis, and he permitted her to review his medical records as to that condition, as well. Petty did not suggest retaining an expert, but did ask Bilbrey about the symptoms of CMT. Bilbrey did not believe she asked what his CMT symptoms were at the time of the incident. He told Petty that, at the time of their meeting, he was experiencing weakness in his legs and hands.

Petty asked Bilbrey to describe his criminal history, and he told her everything he could remember. He told her he could not recall everything he'd been arrested for. Bilbrey told Petty about a prior DUI and a conviction for disturbing the peace. Petty did

12

not mention to Bilbrey that these incidents were not reflected in the prosecution's pretrial summary of his criminal history.

Bilbrey also described the El Cerrito incident to Petty, which they discussed before the preliminary hearing in February 2009. Bilbrey told her he had not been arrested or charged with any crime in association with it. Bilbrey obtained a copy of the police report describing the El Cerrito incident on November 17, 2009. He obtained the report after learning that it might exist, despite the lack of an arrest. To avoid any "surprises" at trial, he gave a copy of the report directly to Petty. Petty said the report was something that they'd "need to look into."

### 3. *Katherine Navarrete's Testimony*

Navarrete is Bilbrey's oldest sister. She is familiar with CMT, because she has seen it affect members of her family, including Bilbrey. She had observed Bilbrey walk with a cane and change employment from physical labor to a desk job "due to lack of strength." She had also observed Bilbrey's hands shake, and she saw him sporadically drop things.

### 4. *Kelly Carrara's Testimony*

Carrara is another of Bilbrey's sisters. She is familiar with CMT, having observed her mother suffer from it. She also suffers from CMT herself. The condition affects her hand strength, and she cannot open bottles or jars without assistance. Carrara also observed the effects of CMT in her brother as of 2008, describing Bilbrey's inability to service her son's car "because he couldn't do it anymore between the ability of holding the tools or getting up and down from the ground."

### 5. *Michael Burt's*[5] Strickland *Expert Testimony*

Burt is an attorney licensed in California since 1978. He is a member of an organization that advises courts and lawyers about the standards and practices in capital criminal cases. Burt's training and experience includes the use of mental state defenses

---

[5] Bilbrey also submitted Burt's written declaration in support of his petition for writ of habeas corpus.

13

in felony cases, meaning "anything that relates to the defendant's ability to form specific intent." The court found Burt qualified to testify as a "*Strickland*[6] expert" in "the standards of practice of defense of felony cases in California."

Burt reviewed the trial and habeas records in Bilbrey's case and articulated why he concluded Bilbrey's trial counsel was "ineffective in a number of respects." Burt's analysis was based solely on his review of the trial record and correspondence between Bilbrey's habeas counsel and trial defense counsel about the defense trial strategy and tactics. Burt believed Petty knew there were at least two applicable defenses for Bilbrey: self-defense and—based on evidence of Bilbrey's intoxication, CMT, and head trauma— mental state defenses. When evidence of such mental conditions is apparent, Burt explained, "the lawyer has an obligation to investigate a mental state defense."

### a. Mental State Defenses

Burt explained the defense attorney's "obligation to factually investigate the basis for a mental state defense before rejecting that defense, even when it conflicts with other defenses that are on the table." Burt elaborated on defense counsel's duty: " 'Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.' " Investigation of mental state defenses also involves the lawyer's collection of the client's records, including intoxication tests and medical records, and talking to people who know the client "to see how the client manifested symptoms of whatever issue you are investigating."

Equally important is the "retention and use of a qualified expert to take the fruits of that investigation and opine as to the significance of the client's mental disabilities or

---

[6] *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).

14

intoxication, whatever the particular issue is." Such experts include "a psychiatrist or neurologist or someone who is schooled and knowledgeable in the particular mental disorders at issue." The lawyer would retain an appropriate expert who would "typically interview the client and render an expert opinion based on review of the collateral records . . . and the interview material you had provided."

In Burt's opinion, where there is evidence that may support a client's mental state defense, it is not reasonable for a lawyer to abandon the defense without consulting an expert. He also emphasized that the purpose of the expert is to educate the jury, not defense counsel, so the need for an expert arises in all serious felony cases where a viable mental defense is present. Burt opined that case law indicates that "counsel's own experience" and "subjective sense of whether or not a jury would like the defense" are not adequate substitutes.

Relying on *People v. Mozingo* (1983) 34 Cal.3d 926 (*Mozingo*), Burt explained that, when faced with two possible conflicting defenses, "counsel's duty is to investigate both lines of defense, and then decide after consultation with the client what applicable defense should be followed." The "standards are very clear that" rejecting a defense without having investigated it factually "is ineffective assistance of counsel."

### b. Self-Defense

Addressing the viability of Bilbrey's actual trial defense, Burt explained that, when asserting self-defense, a lawyer must investigate the facts beyond the defendant's version of events. This includes investigating the victim's propensity for violence, comparing the defendant's statements to the lawyer to those made to other persons, and investigating the defendant's own criminal history and propensity for violence, including obtaining the defendant's rap sheet. Burt also described the importance of presenting to the jury any evidence corroborating the defendant's story.

Under these principles, Burt explained why it was unreasonable for defense counsel to assert self-defense in this case: "[e]specially in light of her representations to the jury about the client's lack of prior violence, to present a self-defense defense when she knew or should have known that the defense would be completely undermined by

15

Mr. Bilbrey's prior history of violence, by his inconsistent statements to the police, which were highlighted by the People, and by the lack of corroboration."

Articulating the prejudice to Bilbrey from counsel's unreasonable tactics, Burt explained that if counsel had not asserted self-defense, but instead had presented a mental state defense, the People would not have been able to focus on Bilbrey's prior history of violence and portray him as "the guy who uses a knife." Rather, a mental state defense "would have taken off the table Mr. Bilbrey's character for violence, which is only applicable to the . . . self-defense situation, and it would have resulted in the production of an expert testimony which would have been strongly supportive of a lack of specific intent defense in the case."

### c. The Two Defenses Together

As the strengths and weaknesses of alternate defenses become apparent, Burt continued, "the client has to be advised of the . . . pitfalls of both lines of defense before you and the client . . . decide what defense you're going to choose." For the defense lawyer, the "client's exposure" to punishment is the "bottom line." For Bilbrey, Burt explained, "reasonably competent counsel" should have focused on avoiding guilty verdicts on the aggravated mayhem charge, for which Bilbrey could be sentenced to life in prison, and the attempted murder charge. The circumstances of Bilbrey's case—"the severity of the injuries inflicted, and the fact that Mr. Bilbrey had a knife and the victim did not"—warranted consideration of whether self-defense was a viable or realistic defense.

Defense counsel's explanation in the record that Bilbrey's self-defense would be incompatible with his mental state defenses did not reflect what occurred at trial where she proceeded to argue both defenses to the jury. Defense counsel's decision to present both defenses was "tactically unreasonable" and prejudicial to Bilbrey because her mental-state arguments were not supported by any expert opinion evidence about the "cumulative effect" of Bilbrey's mental conditions. Thus, after the prosecution presented evidence that Bilbrey's blood alcohol content was above 0.2%, but that he was not so intoxicated that he could not care for himself, "the implication was left that somebody

16

could be a .22 and could be perfectly okay to form the specific intent to kill and maim" required for the attempted murder and aggravated mayhem charges, respectively.

## B. The People's Habeas Evidence

### 1. *Testimony of Defense Counsel Laura Petty*

Petty has been licensed to practice law in California since 1996. Bilbrey retained her to represent him in the underlying criminal trial through jury trial and sentencing.

#### a. Decision to Present Self-Defense

Petty alone selected what defense to present at Bilbrey's trial. Early in the case, she decided to present a self-defense case, knowing it would require Bilbrey to testify and place his credibility at issue. Petty knew when she selected self-defense that Bilbrey was the only person involved who had a knife and that the victim was unarmed. Petty also knew that, for self-defense to be a complete defense for Bilbrey, his use of force had to be reasonable. She also understood imperfect self-defense—for example, if the jury believed Bilbrey had used excessive, rather than reasonable, force to defend himself— would not apply to the charge of aggravated mayhem against Bilbrey. Petty was aware that multiple witnesses described Bilbrey as the aggressor in the fight.

Petty explained to Bilbrey that if they introduced evidence of the victim's propensity for violence, then Evidence Code section 1103 would allow Bilbrey's own propensity for violence to be introduced into evidence. To that end, she asked Bilbrey whether he'd been involved in any fights, including whether he'd used the knife he carried in any "confrontational situation." Bilbrey told her he had never used the knife in such a manner.

#### b. Investigation of Bilbrey's Criminal History

Petty followed her usual practice of requesting information on her client's criminal background only from the prosecution. She did not independently seek information on Bilbrey's criminal history, because she had no reason to believe the history she received from the prosecuting attorney was inaccurate or incorrect. Petty explained that she did not request Bilbrey's rap sheet prior to trial because, at that time, courts prohibited prosecutors from providing a defendant's rap sheet to defense counsel. Instead, Petty

17

explained, "prosecutors have an independent duty to summarize that information and give you a summary of it."

Petty did not receive a copy of Bilbrey's criminal history until "the middle of trial." When she received the history, it contained "some pretty big surprises," including a police report describing the El Cerrito incident from the week before the Tomada stabbing. Petty could not recall, however, whether it was the first time she had heard of the El Cerrito incident. She did not recall Bilbrey having obtained a copy of the relevant police report shortly before trial and could not recall the first time she saw it.

Petty moved to exclude the El Cerrito evidence because it undermined the defense case and would adversely affect Bilbrey's testimony, which had not yet been presented. She told the trial court, had she known of the incident earlier, she might have selected a different defense for Bilbrey. In addition, Petty had stated in her opening argument that Bilbrey had "no prior arrest record" and did not "have a history of physically attacking people." She believed that statement was true when she said it, having understood that Bilbrey had had no prior contact with law enforcement. Her understanding was based on conversations with Bilbrey and the summary of Bilbrey's criminal history provided by the prosecution prior to trial.

### c. Mental State Defenses

Petty was concerned about presenting multiple defenses for Bilbrey, in particular believing "that a mental defense would completely eviscerate a self-defense" and that the two defenses "were absolutely diametrically opposed." As one reason for the incompatibility, Petty believed anything that affected Bilbrey's ability to recall the events of the fight could be used to challenge his credibility as a self-defense witness. Based on her experience handling "thousands of DUI cases," Petty believed that the effects on the human brain at Bilbrey's level of intoxication were "inconsistent with being able to develop the mindset required for self-defense." Petty was also concerned the jury would hear evidence of other attributes associated with such high intoxication, including "increased aggression and decreased self-control, also decreased motor control," which "are all inconsistent with saying I knew what I was doing, I did what I had to because I

18

was under very serious attack." As such, Petty believed a defense premised on Bilbrey's severe intoxication would have eviscerated what she believed to be the strongest defense.

Petty was also aware that Bilbrey had suffered a concussion, possibly before stabbing Tomada. But she concluded there was no need for expert testimony on the effect of such a traumatic brain injury on Bilbrey's mental state, because there was nothing upon which such an expert could opine: "It would have been completely speculative."

Petty also knew Bilbrey had been diagnosed with CMT, but she did not consult with an expert about what impact the disease may have had upon Bilbrey's motor coordination because she "didn't need to" and had "sufficient information to determine that that was not a good idea to focus on." Bilbrey had given her no indication he suffered from symptoms of the disease.

Overall, Petty believed the evidence did not support consulting an expert on the combined effects of Bilbrey's intoxication, concussion, or CMT on his ability to form specific intent "because there weren't individual effects of two of those three" and, therefore, no combined effects. In addition, she believed any focus on Bilbrey's diminished capacity would have been inconsistent with the facts and the defense of self-defense.

Despite her concerns, Petty acknowledged that she ultimately asked the jury to consider the effect of Bilbrey's intoxication on his mental state because "there were some facts that we just could not get away from." She also acknowledged that a person with Bilbrey's blood alcohol content would have difficulty intentionally inflicting the wounds Tomada sustained. In her closing argument, Petty argued the significance of Bilbrey's intoxication and head injury to his ability to form specific intent to kill or maim Tomada, acknowledging that this amounted to a mental state defense.

## C.     Trial Court's Ruling

In a written order, the trial court granted Bilbrey's habeas petition, finding that he received ineffective assistance from defense counsel. The court concluded defense counsel's failure to investigate possible mental defenses—based on evidence of Bilbrey's

19

blood alcohol content, concussion, and CMT—fell outside the range of competence demanded of attorneys in criminal cases. The court found that counsel's failure to investigate was not excused by any knowledge gained from her experience as a criminal defense attorney, any opposition by Bilbrey to presenting a mental state defense, or by the possible conflict between a mental state defense and self-defense.

In addition, the court found counsel's failure to investigate was not excused by her belief that self-defense was a strong, complete defense. Also, the court noted as an unreasonable tactical decision counsel's rejection of a mistrial after disclosure of the El Cerrito incident, which prejudiced Bilbrey's claim of self-defense and belied counsel's claim in opening argument that Bilbrey had no history of physically attacking people.

The court also concluded counsel's failure to investigate was not excused by defense counsel's "general, unspecific, and unsupported" theory that local juries would not be receptive to a mental state defense.

The court found defense counsel's deficient performance prejudiced Bilbrey. The court explained that Greene's testimony about the individual and combined effects of Bilbrey's blood alcohol content, CMT, and traumatic brain injury suggested "that a mental state defense would not necessarily have been inconsistent with the self-defense defense and, if it had been investigated and presented, the outcome of the trial would have been different."

The court thus granted Bilbrey's petition for writ of habeas corpus and concluded "[p]etitioner is entitled to a new trial." Pursuant to section 1506, the People filed a timely notice of appeal on January 5, 2017.

## III.

### *Speedy Trial Motion and Dismissal*

In March 2017, after the People noticed their appeal from the order granting Bilbrey habeas relief and a new trial, Bilbrey moved to dismiss the information for violation of his right to a speedy trial under section 1382. Bilbrey argued the statute required dismissal because he had not been brought to trial within 60 days of the November 21, 2016 habeas order. Bilbrey contended the trial court retained jurisdiction

to rule on the motion under section 1506, which, he argued, required the People to seek a stay of the habeas order pending resolution of their appeal.

The People opposed the motion, arguing their pending habeas appeal divested the trial court of jurisdiction to rule on the motion. In the alternative, they argued in passing that their pending appeal constituted good cause for the delay in retrying Bilbrey.

The trial court heard Bilbrey's motion on March 22, 2017. The court found that the order granting Bilbrey habeas relief had been served on the relevant parties November 21, 2016, and that the People had 60 days thereafter to bring Bilbrey to trial. The court granted the motion, accepting Bilbrey's argument that, absent a stay under section 1506 or Bilbrey waiving time, he was entitled to dismissal under section 1382.

Two days later, the People filed a petition for writ of mandate, asking us to direct the trial court to vacate its dismissal order. We construed the petition as one for a writ of supersedeas and granted it, staying the dismissal order pending resolution of the People's appeal in case no. A150273.[7]

## DISCUSSION

On appeal, the People contend the trial court erred by granting Bilbrey's petition for writ of habeas corpus and by granting his motion to dismiss.

## I.

### A150273. *Trial Counsel Was Ineffective, and the Trial Court Properly Granted Bilbrey's Petition for Writ of Habeas Corpus.*

#### A. Standard of Review

"[W]e review the grant of a writ of habeas corpus by applying the substantial evidence test to pure questions of fact and de novo review to questions of law." (*In re Taylor* (2015) 60 Cal.4th 1019, 1035.)

"Whether trial counsel performed competently, that is, 'reasonabl[y] under prevailing professional norms' (*Strickland*, *supra*, 466 U.S. at p. 688), presents a mixed

_____

[7] On our own motion, we take judicial notice of the record in *People v. Superior Court (Bilbrey)* (May 2, 2017, No. A150861), pursuant to Evidence Code section 452, subdivision (d).

21

question of fact and law. Such questions are 'generally subject to independent review as predominantly questions of law—especially so when constitutional rights are implicated'—and 'include the ultimate issue, whether assistance was ineffective, and its components, whether counsel's performance was inadequate and whether such inadequacy prejudiced the defense.' (*People v. Ledesma* (1987) 43 Cal.3d 171, 219 [*Ledesma*].)" (*In re Resendiz* (2001) 25 Cal.4th 230, 248–249, overruled on another ground in *Padilla v. Kentucky* (2010) 559 U.S. 356, 370–371.)

" '[W]e give great weight to those of the referee's findings that are supported by substantial evidence. [Citations.] This is especially true for findings involving credibility determinations. The central reason for referring a habeas corpus claim for an evidentiary hearing is to obtain credibility determinations [citation]; consequently, we give special deference to the referee on factual questions "requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying." ' " (*In re Lawley* (2008) 42 Cal.4th 1231, 1241, quoting *In re Thomas* (2006) 37 Cal.4th 1249, 1256.)

### B. Ineffective Assistance Claims

To prevail on a claim of ineffective assistance of counsel, petitioner "must show that his attorney's 'representation fell below an objective standard of reasonableness' 'under prevailing professional norms' ([*Strickland*], *supra*, 466 U.S. at p. 688]; *In re Hardy* (2007) 41 Cal.4th 977, 1018) and 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome' ([*Strickland*], at p. 694)." (*In re Valdez* (2010) 49 Cal.4th 715, 729.)

"The burden of proof that the defendant must meet in order to establish his entitlement to relief on an ineffective-assistance claim is preponderance of the evidence." (*Ledesma*, *supra*, 43 Cal.3d at p. 218.)

" 'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it

22

has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.]' ([*Strickland*], *supra*, 466 U.S. at p. 689.)" (*In re Valdez, supra*, 49 Cal.4th at pp. 729–730.)

But "deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. '[D]eference is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions. Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance." (*Ledesma, supra*, 43 Cal.3d at p. 217.)

### 1. *Counsel's Duty to Investigate*

Here, the trial court accepted Bilbrey's argument that defense counsel was ineffective for failure to investigate Bilbrey's possible mental state defenses.

" 'It is counsel's duty to investigate carefully all defenses of fact and of law that may be available to the defendant, and if [his or her] failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he was entitled.' " (*In re Williams* (1969) 1 Cal.3d 168, 175, quoting *People v. Ibarra* (1963) 60 Cal.2d 460, 464, abrogated on other grounds by *People v. Pope* (1979) 23 Cal.3d 412, 427.)

" '[B]efore counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation.' [Citations.] ' "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices

23

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." ' " (*In re Thomas*, *supra*, 37 Cal.4th at p. 1258.)

"To establish that investigative omissions were constitutionally ineffective assistance, defendant must show at the outset that 'counsel knew or should have known' further investigation might turn up materially favorable evidence." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1244, superseded on other grounds by statute as stated in *People v. Centeno* (2014) 60 Cal.4th 659, 676.) A possible conflict between defenses does not excuse counsel's failure to investigate the potential strengths of a "mental defense." (*Mozingo*, *supra*, 34 Cal.3d at p. 934.) By inaction, deliberate or otherwise, counsel may deprive him- or herself of " 'the reasonable bases upon which to reach *informed* tactical and strategic trial decisions.' " (*Ibid*., quoting *People v. Frierson* (1979) 25 Cal.3d 142, 163.) Similarly, a client's initial opposition does not "excuse counsel from undertaking sufficient investigation of possible defenses to enable counsel to present an *informed* report and recommendation" to the client. (*Ibid*.)

### 2. *Analysis*

#### a. Deficient Performance

"To support a defense of 'diminished actuality,' a defendant presents evidence of voluntary intoxication or mental condition to show he 'actually' lacked the mental states required for the crime." (*People v. Clark* (2011) 52 Cal.4th 856, 880, fn. 3.)

In an appropriate case, to render competent assistance, the duty to investigate includes "the obtaining of a psychiatric investigation." (*People v. Frierson*, *supra*, 25 Cal.3d at pp. 160–161.) The decision not to raise a mental defense, "wholly without the benefit of medical opinion in the matter and with full knowledge that medical reports

24

were in existence," can constitute ineffective assistance of counsel. (*In re Saunders* (1970) 2 Cal.3d 1033, 1048–1049.)

The evidence Bilbrey presented at the hearing on his petition for writ of habeas corpus reflects that defense counsel knew of Bilbrey's mental conditions—his high level of intoxication and concussion during the incident, and his pre-existing CMT—prior to trial. Counsel knew an expert could have testified that Bilbrey's high intoxication would have made it difficult for him to intentionally inflict the wounds on Tomada and that such evidence would have been useful for the jury to hear in evaluating whether Bilbrey had the specific intent to maim or kill Tomada. She also knew that a traumatic brain injury "could cause someone to lose their ability to understand what's going on around them" and affect their "orientation in space" and "motor coordination." Counsel even addressed these two aspects of Bilbrey's mental state in her opening statement, contending that each negatively impacted Bilbrey's memory of the incident. Thus, the evidence shows defense counsel knew or should have known that further investigation of these conditions would have revealed material evidence favorable to a mental state defense.

Defense counsel did not dispute that she did not consult with experts concerning the effects these conditions might have had on Bilbrey's mental state during the incident. Counsel believed she "knew enough about the effects on the brain of intoxication" that she did not need to consult with anyone about them. She also believed it unnecessary to consult with an expert on the impact of Bilbrey's concussion, because she "would have been asking a neurologist . . . to completely speculate." As to Bilbrey's CMT, counsel concluded she had sufficient information from Bilbrey himself, that he was not suffering any symptoms of the condition, that she did not need to consider it further in determining his defense. Overall, Petty believed she knew enough about Bilbrey's mental conditions not to pursue them as bases for a mental state defense for Bilbrey.

As such, defense counsel rejected a mental state defense for Bilbrey in favor of self-defense without further investigation or information. In fact, counsel implied that she selected Bilbrey's defense before fully investigating alternatives when she acknowledged, "If I had decided to pursue [a mental state] defense, I might very well

25

have asked the doctor, 'Hey, if you were to testify, what would you talk about?" The law requires the reverse approach, however. Counsel must ask such questions *before* deciding on a defense, not after, to ensure that the accused receives effective assistance in a criminal trial.

Bilbrey's habeas evidence indicated what sort of mental state defense further investigation would have yielded. By calling Greene, Bilbrey demonstrated the value of consulting with an expert witness who had personally evaluated Bilbrey and reviewed his medical records. Greene not only confirmed the existence of Bilbrey's medical conditions, but described the deleterious effects of each condition upon his motor skills, coordination, perception and judgment. He opined that a person suffering from the cumulative effects of all three conditions would experience significant "psychomotor impairment," such that the person would have difficulty wielding a knife with the accuracy needed to intentionally inflict the type of stab wounds suffered by Tomada. This was material evidence favorable to Bilbrey on the two most serious charges against him, for aggravated mayhem and attempted murder.

Similarly, the brief testimony from two of Bilbrey's sisters showed what favorable information counsel could have obtained from Bilbrey's family members. Both sisters are familiar with the family history of CMT, and one suffers from CMT herself. Both sisters also indicated Bilbrey experienced significant symptoms affecting his strength and motor skills around the time of the incident and continued to suffer from such symptoms thereafter.

Perhaps most importantly, Greene undercut defense counsel's stated belief that any mental state defense would be "diametrically opposed" to her chosen theory that Bilbrey had acted in self-defense. Indeed, we agree with the trial court that Greene's testimony suggested the two defenses would not necessarily have been inconsistent if both had been adequately investigated and presented. For example, Greene testified that an intoxicated person who has not "blacked out" can still recall in detail events that occurred while they were intoxicated. This suggests, contrary to Petty's stated understanding, that Bilbrey's intoxication would not have prevented him from being a

26

credible self-defense witness. Similarly, *Strickland* expert Burt suggested that counsel faced with evidence supporting multiple, potentially contradictory defenses, is obligated to investigate them all and do more to reconcile them for the client's benefit, such as presenting expert testimony.

The trial court heard directly from these witnesses and implicitly found the evidence in support of Bilbrey's ineffective assistance of counsel claim credible, and we may not revisit that determination on appeal. (*In re Lawley*, *supra*, 42 Cal.4th at p. 1241.)

Under these circumstances, we conclude defense counsel's failure to investigate impermissibly withdrew a crucial defense from the case and the jury's consideration. Facts known to counsel, before trial, required further investigation before she rejected a mental state defense for Bilbrey. Counsel's obligation existed independently of her own experience and knowledge or the other excuses she proffered in opposing the writ of habeas corpus. Because the record reflects counsel rejected a mental state defense for Bilbrey without such investigation, including soliciting medical or other expert opinion in the matter, counsel's performance was objectively unreasonable under prevailing professional norms and, therefore, deficient.[8]

### b. Prejudice

We agree with the trial court's conclusion that defense counsel's deficient

---

[8] Because we conclude counsel was ineffective on this ground, we need not address whether counsel's investigation of, and decision to proceed on, a theory of self-defense was also ineffective assistance. We interpret the trial court's order granting the writ of habeas corpus as holding only that counsel was ineffective in failing to investigate and present a mental state defense. Other findings made by the trial court in its order— such as that defense counsel did not adequately investigate Bilbrey's self-defense theory and unreasonably declined to accept a mistrial after the admission of evidence damaging to that defense—only supported its conclusion that failure to investigate a mental state defense was unreasonable by demonstrating the weaknesses in defense counsel's choice. These findings were not independent bases for the ineffectiveness finding. We note, though, that on the more limited record in Bilbrey's direct appeal, we declined to find counsel ineffective for withdrawing the request for a mistrial. (*People v. Bilbrey* (May 14, 2013, A129236) [nonpub. opn.].)

performance prejudiced Bilbrey such that, but for counsel's errors, it is reasonably probable the result at trial would have been different.

First, counsel's failure to investigate deprived her and Bilbrey of the ability to make an informed choice about what defense or defenses to present on Bilbrey's behalf. (See *Mozingo*, *supra*, 34 Cal.3d at p. 934.) The duty of counsel to investigate is not an end in itself. Rather, fulfilment of that duty ensures that counsel's strategic and tactical decisions are reasonably informed by the circumstances of the case. Without a reasonable investigation by counsel of Bilbrey's mental state defense, we cannot conclude that counsel's choice to rely solely on a self-defense theory was informed or reasonable.

Second, counsel's deficient performance deprived the jury of the opportunity to consider whether the prosecution had proven beyond a reasonable doubt that Bilbrey had the specific intent required to convict him of the two most serious charges: aggravated mayhem and attempted murder. Had counsel presented a mental state defense as previewed at the habeas hearing, Bilbrey would have been entitled to have the jury instructed pursuant to CALCRIM No. 3428. That instruction would have informed the jury that it could consider evidence showing Bilbrey suffered from a mental disease, defect, or disorder for "the limited purpose of deciding whether, at the time of the charged crime, [Bilbrey] acted [or failed to act] with the intent or mental state required for that crime." The instruction would have also informed the jury that "[t]he People have the burden of proving beyond a reasonable doubt that [Bilbrey] acted [or failed to act] with the required mental state." (CALCRIM No. 3428.) Had defense counsel presented evidence in support of this instruction and requested it, the court would have been required to so instruct the jury and the jury would have been required to consider it. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

The People maintain that the evidence of Bilbrey's specific intent to maim and/or kill Tomada was so overwhelming that the jury could not have entertained a reasonable doubt as to that element of the aggravated mayhem and attempted murder charges. This court agreed on direct appeal that substantial evidence supported the intent elements of

28

those offenses. (*People v. Bilbrey* (May 14, 2013, A129236) [nonpub. opn.].) We found substantial evidence of Bilbrey's specific intent to maim in evidence that he had remained uninvolved in the fight until he "had an opportunity to decide if, how, and where he would strike Tomada." (*Ibid.*) When he did strike Tomada, we found, the jury could have concluded "that Bilbrey's actions were controlled and directed" rather than "indiscriminate." (*Ibid.*)

But the evidence of Bilbrey's specific intent to maim or kill is substantial only if it can be inferred that his actions reflected his true intent. Absent the ability to consider any evidence that Bilbrey, at the time of the incident, was suffering from a mental condition that affected his motor skills, perception, and ability to form specific intent, the only reasonable inference available to the jury was that Bilbrey's intent was congruent with the result. Counsel's deficient performance deprived the jury of the chance to consider other evidence.

The People dispute this notion, noting that Bilbrey's defense counsel requested and received a jury instruction on the mental state defense of involuntary intoxication, which the jury considered and rejected. But, aside from the fact that Bilbrey's blood alcohol content was at or above 0.2% at the time of the fight, the record reflects the defense presented no evidence explaining why such intoxication might have precluded Bilbrey's specific intent. In addition, the record reflects defense counsel made the jury aware of Bilbrey's other mental conditions, but only in passing and, similarly, without the benefit of expert opinion addressing the effect of those conditions, individually or collectively, on Bilbrey's mental state. As such, the jury was left to determine on its own the effect of Bilbrey's conditions, individually and in combination, on his mental state.

Under these circumstances, we conclude there is a reasonable probability that Bilbrey would have achieved a more favorable result if counsel had investigated and presented a diminished actuality defense. Had the jury been asked to consider such a defense and, as the trial court did in granting habeas relief, found it credible, jurors reasonably could have questioned Bilbrey's specific intent to maim or kill Tomada. Had just one of those jurors concluded there was a reasonable doubt that Bilbrey had the

29

required specific intent to maim or kill, the jury could have found Bilbrey not guilty of aggravated mayhem and/or attempted murder and found him guilty only of violating the lesser included offenses of mayhem and/or attempted voluntary manslaughter. Then, rather than the lengthy sentences imposed on the greater offenses—life with the possibility of parole and 11 years, respectively, for aggravated mayhem and attempted murder—Bilbrey's punishment for convictions under the lesser included charges would have been a determinate term of no more than eight years in prison. (Pen. Code, §§ 203/204 and 193/664.)

For these reasons, we conclude defense counsel's deficient performance prejudiced Bilbrey and warranted granting his petition for writ of habeas corpus on the basis of ineffective assistance of counsel.

## II.

### A151401. The Trial Court Retained Jurisdiction to Rule on Bilbrey's Motion to Dismiss, and the People Have Not Shown the Trial Court Abused its Discretion by Granting the Motion.

The People also appeal from the trial court's order granting Bilbrey's post-habeas motion to dismiss for violation of his right to a speedy trial under section 1382. They argue their appeal in case No. A150273 divested the trial court of jurisdiction to rule on Bilbrey's motion to dismiss because the motion was a "matter related to, embraced by, or affected by" the appeal from the habeas order granting Bilbrey a new trial. They also argue section 1506 of the Penal Code, which authorizes their appeal from the habeas order, did not require them to seek a stay of the order pending their appeal because "the trial court effectively ordered him discharged or released." As to the merits of the dismissal order, the People maintain dismissal was improper both because an appealed habeas order is not final and because the pending appeal constituted good cause to delay Bilbrey's retrial beyond the 60-day deadline.

In response, Bilbrey contends the trial court retained jurisdiction to rule on his motion to dismiss because the People failed to seek a stay of the habeas order as required by section 1506. The People were required to request a stay under that statute, Bilbrey

30

argues, because the habeas order granted him " 'relief other than a discharge or release from custody.' " On the merits, Bilbrey argues dismissal was required because his retrial did not begin within 60 days of the November 21, 2016 habeas order as required by section 1382, and he notes the absence of authority indicating that a pending appeal, by itself, constitutes good cause to delay trial beyond the statutory deadline.

The parties do not dispute that Bilbrey has remained in custody pending the People's appeal from the habeas order granting him a new trial.

**A. The Trial Court Retained Jurisdiction to Rule on the Motion to Dismiss**

We review de novo the People's claim that the trial court lacked jurisdiction to grant Bilbrey's section 1382 motion. (See *Day v. Collingwood* (2006) 144 Cal.App.4th 1116, 1123 [applying de novo standard of review in determining whether trial court had jurisdiction to rule on post-judgment sanctions motion].) Questions of statutory interpretation are also reviewed de novo. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95.)

#### 1. *Analysis*

"The general rule is that ' " '[t]he filing of a valid notice of appeal vests jurisdiction of the cause in the appellate court until determination of the appeal and *issuance of the remittitur*' [citation], thereby divesting the trial court of jurisdiction over anything affecting the judgment. [Citations.]" ' " (*People v. Tulare County Superior Court (Gregory)* (2005) 129 Cal.App.4th 324, 329 (*Gregory*), quoting *People v. Flores* (2003) 30 Cal.4th 1059, 1064 (*Flores*).)  The purpose of this common law rule " ' "is to protect the appellate court's jurisdiction by preserving the status quo until the appeal is decided.  The rule prevents the trial court from rendering an appeal futile by altering the appealed judgment . . . by conducting other proceedings that may affect it." ' " (*Gregory*, at p. 329, quoting *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1089.)  This rule applies where habeas corpus proceedings are concerned.[9] (*Ibid.*)

"Jurisdiction survives, however, where provided by statute." (*Flores*, *supra*, 30 Cal.4th at p. 1064.)  "In such cases, the jurisdictional period generally is not tolled during the pendency of an appeal." (*Ibid.*)  "The prosecution's right to appeal in a criminal case is strictly limited by statute." (*People v. Chacon* (2007) 40 Cal.4th 558, 564.)  "Long standing authority requires adherence to these limits even though 'the

---

[9] The parties devote substantial briefing to section 916, subdivision (a), a section of the Code of Civil Procedure that sets forth the same general rule for civil cases.  The parties assume without discussion that section 916, subdivision (a) governs jurisdiction in criminal proceedings.  That section is contained in part 2 of the Code, which is entitled "Of Civil Actions," and in title 13 of that part, which is entitled "Appeals in Civil Actions," suggesting it is inapplicable in criminal proceedings.  (See *People v. Superior Court (Laff)* (2001) 25 Cal.4th 703, 727–732 [holding Code Civ. Proc. § 639, also contained in part 2, applies only in civil matters].)  "[I]t is well established that ' "chapter and section headings [of an act] may properly be considered in determining legislative intent" [citation], and are entitled to considerable weight.' " (*People v. Hull* (1991) 1 Cal.4th 266, 272, quoting *American Federation of Teachers v. Board of Education* (1980) 107 Cal.App.3d 829, 836.)  The comparable common law rule that has been applied in criminal proceedings is generally the same except that the cases applying that rule recognize that the Legislature may create exceptions by statute.

People may thereby suffer a wrong without a remedy.' " (*Ibid*., quoting *People v. Superior Court (Howard)* (1968) 69 Cal.2d 491, 499.)

In the criminal context, the Legislature has enacted statutes specifically addressing the effect of a pending appeal on proceedings in the trial court. These statutes prescribe the effects of both direct appeals and habeas appeals. One statute concerning direct appeals is section 1242, enacted in 1874.[10] Section 1242 reads, "An appeal taken by the people in no case stays or affects the operation of a judgment in favor of the defendant, until judgment is reversed." (§ 1242.) Similarly, section 1243 states that an appeal from a judgment of conviction (other than where a death sentence has been imposed) "does not stay the execution of the judgment or order granting probation . . . unless the trial court shall so order." (§ 1243.) "The granting or refusal of such an order," section 1243 continues, "shall rest in the discretion of the court." (*Ibid*.) We read these statutes as effectively providing the prevailing party with the benefit of their success in the trial court pending resolution of any appeal, subject, in the case of appeals governed by section 1243, to the court's discretion to stay its enforcement.

Section 1506 functions similarly in the context of proceedings on petitions for a writ of habeas corpus. Section 1506[11] specifically authorizes and governs the People's

---

[10] We believe section 1235, et seq. applies in the context of only direct criminal appeals. The fact that section 1235, et seq., appears under title 9, chapter 2 of part 2 of the Penal Code—titled "Appeals in Felony Cases"—supports an inference that those sections apply only in direct appeals from criminal judgments and orders. Similarly, the fact that section 1506 appears under title 12, chapter 1 of part 2—titled "Of the Writ of Habeas Corpus"—supports an inference that section 1506 applies only to appeals in habeas proceedings. (See *People v. Hull*, *supra*, 1 Cal.4th at p. 272.) Thus, though we find section 1242 provides interpretive context for the question before us, we conclude it does not apply to this habeas appeal.

[11] In full, section 1506 reads, "An appeal may be taken to the court of appeal by the people from a final order of a superior court made upon the return of a writ of habeas corpus discharging a defendant or otherwise granting all or any part of the relief sought, in all criminal cases, excepting criminal cases where judgment of death has been rendered, and in such cases to the Supreme Court; and in all criminal cases where an application for a writ of habeas corpus has been heard and determined in a court of appeal, either the defendant or the people may apply for a hearing in the Supreme Court.

33

appeal from a superior court's order upon the return of a writ of habeas corpus. In fact, "the whole purpose of section 1506 was to make orders of the superior court on habeas corpus reviewable." (*People v. Huff* (1975) 46 Cal.App.3d 361, 364 (*Huff*).) That is, prior to enactment of the statute in 1927, the People had no right to appeal from an order made upon the return of a writ of habeas corpus and were "very greatly handicapped by having no redress where a defendant is improperly released on habeas corpus." (Rep. of the Comm. for the Reform of Crim. Proc. (1927) p. 29.)

Until 1957, section 1506 stated that an appeal could be taken "by the people from a final order of a superior court made upon the return of a writ of habeas corpus discharging a defendant after his conviction, in all criminal cases" with certain exceptions.[12] The statute contained language similar to that it currently contains

Such appeal shall be taken and such application for hearing in the Supreme Court shall be made in accordance with rules to be laid down by the Judicial Council. If the people appeal from an order granting the discharge or release of the defendant, or petition for hearing in either the court of appeal or the Supreme Court, the defendant shall be admitted to bail or released on his own recognizance or any other conditions which the court deems just and reasonable, subject to the same limitations, terms, and conditions which are applicable to, or may be imposed upon, a defendant who is awaiting trial. If the order grants relief other than a discharge or release from custody, the trial court or the court in which the appeal or petition for hearing is pending may, upon application by the people, in its discretion, and upon such conditions as it deems just stay the execution of the order pending final determination of the matter."

[12] As originally enacted in 1927, section 1506 read: "An appeal may be taken to the district court of appeal by the people from a final order of a superior court made upon the return of a writ of habeas corpus discharging a defendant after his conviction, in all criminal cases prosecuted by indictment or information in a court of record, excepting criminal cases where judgment of death has been rendered, and in such cases to the supreme court; and in all criminal cases prosecuted by indictment or information in a court of record, where upon appeal or original application after conviction of the defendant an application for a writ of habeas corpus has been heard and determined in a district court of appeal, either the defendant or the people may apply for a hearing in the supreme court. Such appeal shall be taken and such application for hearing in the supreme court shall be made in accordance with rules to be laid down by the judicial council. If the people appeal, or petition for hearing in either the district court of appeal or the supreme court, the defendant shall not, in any case in which the judgment of conviction has become final, be discharged from custody pending final decision upon the

providing that if the people appeal, the defendant may be admitted to bail pending appeal. In 1957, however, the Legislature added the final sentence addressing an appeal from a habeas order that "grants relief other than a discharge or release from custody." (See Stats. 1957, ch. 1561, § 1.) The report of the Legislative Counsel on the 1957 amendment stated that it "Grants to the people the right to appeal from a final order of a superior court granting all or any part of the relief sought in a habeas corpus proceeding, rather than only from an order discharging defendant" and "Provides that if the order grants relief other than a discharge from custody, the trial court or court in which the appeal or petition for hearing is pending may, upon application by the people, in its discretion, and upon such conditions as it deems just, stay the execution of the order pending final determination of the matter." (Legis. Counsel Rep. on Sen. Bill No. 439 (1957 Reg. Sess.).)

Prior to the 1957 amendment, the issue had arisen whether the People could "appeal from an order on habeas corpus which directs that a petitioner be granted relief but which does not order his release from custody." (*In re Chessman* (1955) 44 Cal.2d 1, 4.) In *Chessman*, the petitioner argued they could not, claiming the term "discharge" as used in section 1506 did not include relief "short of effecting their release from illegal custody." (*Chessman*, at p. 5.) The court interpreted "discharge" broadly to encompass not only discharge from imprisonment or restraint but also discharge "from illegal conditions of restraint although not from all restraint." (*Id.* at p. 6.) Nonetheless, apparently recognizing the statutory reference to "discharge" was ambiguous, the State Bar proposed the 1957 amendment to "clarify the law" by adding language allowing the People to appeal from an order "granting any relief sought in a petition for writ of habeas corpus even though the defendant is not discharged from custody." (32 Journal of the State Bar of California (Jan.–Feb. 1957) 1957 Legislative Program, pp. 21–22.) The

---

appeal or petition for hearing and he must, in such cases, be retaken into custody if he has been discharged; *provided, however*, that in bailable cases the defendant may be admitted to bail, in the discretion of the judge, pending decision of the appeal or petition for hearing." (See Stats. 1927, ch. 628, § 1, italics added.)

State Bar explained that the statute was amended to codify the decision in *Chessman*. (Fourth Progress Rep. to the Legis. by the Sen. Interim Judiciary Com., Rep. on Sen. Bill No. 439 (1957 Reg. Sess.) p. 354.)

More fundamentally here, section 1506 also now distinguishes between the effects of the People's appeal from a habeas order granting release or discharge and their appeal from an order granting "other" relief. Notably, in both situations and as with sections 1242 and 1243 in the context of direct appeals, section 1506 allows the prevailing habeas petitioner to enjoy the benefits of a favorable trial court disposition during the pendency of the appeal, subject to certain limitations. Specific to our purpose here, on appeal from such an order that "grants relief other than a discharge or release from custody" the trial or appellate court may, "upon application by the people, in its discretion, and upon such conditions as it deems just, stay the execution of the order pending final determination of the matter." (§ 1506.) Thus, a defendant who is granted partial relief—something short of release or discharge—may benefit from execution of the favorable order pending the People's appeal *unless* the trial or appellate court exercises its discretion to grant a stay requested by the People. The question before us is what effect the People's appeal has on execution of the order granting habeas relief if, as here, the People do *not* request and receive a stay.

The parties cite no authority previously interpreting or applying the stay provision of section 1506, and our research discloses none that squarely answers the question before us. As noted by the People at oral argument, some courts have referred to section 1506 in the limited context of noting, mostly impliedly, that certain forms of habeas relief constitute relief "other than release or discharge" and are, therefore, eligible for a stay pending appeal under section 1506. (See *In re Stinnette* (1979) 94 Cal.App.3d 800 [habeas order effectively releasing respondent on parole]; *In re Brindle* (1979) 91 Cal.App.3d 660 [order granting incarcerated persons access to public defenders]; *In re Fain* (1976) 65 Cal.App.3d 376 [order granting determination of prison term]; and *In re Muszalski* (1975) 52 Cal.App.3d 475 [order granting inspection of confidential documents in Department of Corrections file].) One such case involved the People's

36

appeal from a habeas order granting petitioner a new trial. (*In re Rhymes* (1985) 170 Cal.App.3d 1100, 1103.) There, without explaining the circumstances, the court noted that "[t]he superior court ordered that petitioner continue to remain free on her own recognizance" and that, "[p]ending the resolution of the instant appeal, the court below stayed the retrial of petitioner." (*Ibid.*) Still, no court has expressly attempted to answer the question whether, absent a stay, the People's appeal from an order granting relief other than a discharge or release on habeas corpus automatically stays the order such that no stay is required.[13]

One of the few cases otherwise interpreting section 1506 since its 1957 revision is *Huff*, *supra*, 46 Cal.App.3d 361. In *Huff*, the court permitted the People to proceed with their appeal from a habeas order reducing the defendant's sentence due to defects in obtaining his prior convictions. (*Id.* at p. 363.) Upon granting relief, the trial court had released the defendant, but the appellate court termed this only "partial relief" and determined that the part of section 1506 requiring a defendant in such a case to be returned to custody if the People appeal did not apply. (*Id.* at p. 365.)

The People appealed, "but made no application for a stay of the order. (Pen. Code, § 1506.)" (*Huff*, *supra*, 46 Cal.App.3d at pp. 363–364.) Huff moved to dismiss the appeal "on the ground that Penal Code section 1506 applies to this appeal and that the People had not complied with said section because of the People's failure to request a stay of the court's order." (*Id.* at p. 364.) The People opposed, in part arguing that section 1506 did not require them to apply for a stay before proceeding with their appeal. (*Ibid.*) The court held section 1506 does not require the People to apply for and

_____

[13] The parties rely in their briefs on *Gregory*, *supra*, 129 Cal.App.4th 324, and we asked them to focus at oral argument on its impact on this case. *Gregory* does not answer the question before us, however. There, the court considered what effect a pending habeas appeal had on the trial court's jurisdiction to act in the same habeas proceeding. (*Gregory*, at p. 332.) The court was not required, as are we, to decide the impact of a pending habeas appeal on the trial court's jurisdiction to act in the underlying prosecution itself. Therefore, though we acknowledge that *Gregory*'s holding is in tension with our own, we conclude it is largely inapposite here.

receive a stay "as a prerequisite to preserving the right to appeal under [section] 1506." (*Ibid.*)

After quoting most of section 1506, including the stay provision, the court explained more generally, "The effect of section 1506 may be illustrated as follows:  (1) if an appeal is not taken an order becomes final when the time for appeal has passed [citation]; (2) if an appeal is taken, and a request for a stay of the order is made and granted, then the order is stayed pending appeal (Pen. Code, § 1506); and (3) *if an appeal is taken and a request for stay is denied or no request for stay is made, then the appeal has no effect on the order unless and until the order is reversed.* [Citations.]  At bench the case falls into the latter category." (*Huff*, *supra*, 46 Cal.App.3d at p. 365, italics added.)  The court then denied the motion to dismiss the appeal and proceeded to the merits, affirming the habeas order.  (*Id.* at pp. 364–367.)

Considering *Huff* and the foregoing statutory analysis, we interpret the operative language of section 1506 to create an exception to the general jurisdiction rule set forth in *Flores*.  As such, absent a stay, the trial court has jurisdiction to execute a habeas order despite the pendency of the people's appeal from that order.  If the trial court did not otherwise have jurisdiction to act, there would be no need for the statute to provide for the availability of a stay.  Any argument that such a stay is not necessary to prevent the trial court from proceeding would render meaningless the provision of section 1506 allowing the People to seek a stay and the court to grant one—running afoul of "one of guiding principles of statutory construction, that significance be accorded every word of an act." (*People v. Johnson* (2002) 28 Cal.4th 240, 246–247.)

The People do not really argue otherwise.  They concede in their opening brief that the statute requires them to apply for a stay when a habeas order grants relief other than discharge or release from custody.[14]  They contend, however, that the relief here *was*

---

[14]  Nor do they dispute that they did not seek a timely stay of the habeas order in this case.  The record reflects the People eventually sought a stay under section 1506. But they did not do so until March 22, 2017, after the trial court granted Bilbrey's section 1382 motion to dismiss.  Moreover, the People's written motion sought a stay of

"effectively" a discharge or release from custody. We are not persuaded. The parties do not dispute that the habeas order did not actually discharge or release Bilbrey from custody. The argument that the order granting a new trial "effectively" discharged or released Bilbrey rests on an interpretation of the statutory language that is not reasonable, particularly given the Legislature's amendment of section 1506 to distinguish between discharge or release, on the one hand, and other types of relief, on the other. The amendment, which retained the reference to "discharging a defendant" but added "or otherwise granting all or any part of the relief sought" and the provision authorizing a stay of an order "grant[ing] relief other than a discharge from custody," indicates the Legislature intended the word "discharge" in the amended statute to mean a discharge from custody and not to encompass other types of habeas relief. (See Stats. 1957, ch. 1561, § 1.) Moreover, the People fail to explain why, if a grant of new trial falls within the terms "discharge" and "release," the same could not be said of any relief a court might grant on habeas corpus to a defendant who will remain in state custody. The People's interpretation of release and discharge as all-encompassing would render the language "otherwise granting all or any part of the relief sought" and "relief other than a discharge or release from custody" entirely superfluous, again violating a core principle of statutory construction.

We are also not persuaded by the People's argument that section 1506 should not be interpreted to confer jurisdiction on the trial court to execute a habeas order granting petitioner a new trial pending the People's appeal from that order. We discern no such limits on the scope of section 1506 from the statute itself, its legislative history, or the applicable—albeit limited—case law.

We recognize that the general rule that an appeal automatically stays the trial court judgment serves the purpose of preventing the trial court from interfering with the

---

the dismissal order rather than the habeas order. The record does not reflect the trial court's disposition of the People's motion, though presumably the court denied it. As described above, however, we stayed the dismissal order pending resolution of the People's appeal in case No. A150273 on May 2, 2017.

appellate court's jurisdiction and rendering the appeal moot. Our interpretation and application of section 1506 does not contravene that purpose. If the People and the trial court had proceeded to retry Bilbrey while the People's appeal from the order granting habeas corpus was pending, this would have interfered with this court's jurisdiction. Had that occurred, we would have considered the appeal just as we have done, and if we had reversed the order granting Bilbrey relief on the ground of ineffective assistance of counsel, the original judgment against Bilbrey would have been reinstated and Bilbrey returned to custody to serve his original sentence. The speedy trial violation would become moot because the grant of new trial would be reversed. While we have reached a different result in the habeas appeal, the People have not been prevented from prosecuting that appeal and we have not been impeded in considering it.

Thus, we agree with Bilbrey that, absent a stay pending resolution of the People's appeal, the trial court retained jurisdiction over his case, including his motion to dismiss. The language and context of section 1506 necessarily imply that a court that grants habeas relief other than a discharge from custody retains jurisdiction to undertake further proceedings despite the pending appeal unless and until the People request and the court grants a stay. Here, the People did not seek a stay, meaning the trial court retained jurisdiction to rule on Bilbrey's motion to dismiss. We turn, then, to consider the propriety of the trial court's order granting that motion.

**B. The Section 1382 Dismissal Order Was Proper.**

We review a trial court's ruling on a motion to dismiss pursuant to section 1382 of the Penal Code for abuse of discretion. (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1197–1198.)

Section 1382, subdivision (a) provides in relevant part that, "unless good cause to the contrary is shown," a court "shall order the action to be dismissed" in a felony case when the defendant "is not brought to trial . . . after the issuance of a writ or order, which, in effect, grants a new trial, within 60 days after notice of the writ or order is filed in the

40

trial court and served upon the prosecuting attorney." (§ 1382, subd. (a), (a)(2).)**[15]** The language concerning a writ or order granting new trial was added to the statute after the courts in *Sykes v. Superior Court* (1973) 9 Cal.3d 83 (*Sykes*) and *People v. Guaracha* (1969) 272 Cal.App.2d 839 held that felons who are afforded habeas corpus relief granting a new trial are entitled to a speedy retrial. (5 Witkin, Cal. Crim. Law (4th ed. 2012) Criminal Trial, § 338, p. 568; see Stats. 1973, ch. 847, § 1.)

---

**[15]** Section 1382, subdivision (a)(2) provides in its entirety:

"(2) In a felony case, when a defendant is not brought to trial within 60 days of the defendant's arraignment on an indictment or information, or reinstatement of criminal proceedings pursuant to Chapter 6 (commencing with Section 1367) of Title 10 of Part 2, or, in case the cause is to be tried again following a mistrial, an order granting a new trial from which an appeal is not taken, or an appeal from the superior court, within 60 days after the mistrial has been declared, after entry of the order granting the new trial, or after the filing of the remittitur in the trial court, or after the issuance of a writ or order which, in effect, grants a new trial, within 60 days after notice of the writ or order is filed in the trial court and served upon the prosecuting attorney, or within 90 days after notice of the writ or order is filed in the trial court and served upon the prosecuting attorney in any case where the district attorney chooses to resubmit the case for a preliminary examination after an appeal or the issuance of a writ reversing a judgment of conviction upon a plea of guilty prior to a preliminary hearing. However, an action shall not be dismissed under this paragraph if either of the following circumstances exists:

"(A) The defendant enters a general waiver of the 60-day trial requirement. A general waiver of the 60-day trial requirement entitles the superior court to set or continue a trial date without the sanction of dismissal should the case fail to proceed on the date set for trial. If the defendant, after proper notice to all parties, later withdraws, in open court, his or her waiver in the superior court, the defendant shall be brought to trial within 60 days of the date of that withdrawal. Upon the withdrawal of a general time waiver in open court, a trial date shall be set and all parties shall be properly notified of that date. If a general time waiver is not expressly entered, subparagraph (B) shall apply.

"(B) The defendant requests or consents to the setting of a trial date beyond the 60-day period. In the absence of an express general time waiver from the defendant, or upon the withdrawal of a general time waiver, the court shall set a trial date. Whenever a case is set for trial beyond the 60-day period by request or consent, expressed or implied, of the defendant without a general waiver, the defendant shall be brought to trial on the date set for trial or within 10 days thereafter."

41

The statutory speedy trial rights provided in section 1382 and related sections of the Penal Code " 'are supplementary to and a construction of' the state constitutional speedy trial guarantee." (*People v. Martinez* (2000) 22 Cal.4th 750, 766.) "[S]ection 1382 constitutes a legislative endorsement of dismissal as a proper judicial sanction for violation of the constitutional guarantee of a speedy trial and as a legislative determination that a trial delayed more than 60 days is prima facie in violation of a defendant's constitutional right." (*Sykes*, *supra*, 9 Cal.3d at p. 89.)

Here, the People first argue dismissal was improper because the 60-day period for Bilbrey to be retried has not begun to run, and will not do so unless and until the habeas order becomes final. They rely on *Sykes*, suggesting that the time period runs only when the People do not appeal. The People suggest their appeal of the habeas order tolled the 60-day period pending the outcome of their appeal. We find no support for this proposition in *Sykes*.

In *Sykes*, our Supreme Court considered whether the 60-day period applied where a petitioner had obtained relief by way of a writ of habeas corpus rather than one of the procedures described in the express provisions of the then current version of section 1382 (i.e., after a mistrial, entry of an order granting a new trial or filing of a remittitur in the trial court after a conviction has been reversed on appeal). (*Sykes*, *supra*, 9 Cal.3d at pp. 88–90.) Invoking the self-executing provisions of the California Constitution, which independently guarantee the right to a speedy trial, the court noted that a "person who has been released on a writ and ordered to be rearraigned for plea and retried on the original charges has the same interest in a speedy trial as do persons whose circumstances come within the express provisions of [section 1382]." (*Sykes*, at p. 92.) Thus, the court concluded, there was "no reasonable justification for excluding from the 60-day provision those defendants who establish their right to a retrial by way of a writ as distinguished from those who establish such right by other legal processes." (*Ibid.*) Upon concluding the People had failed to show good cause for the delay in retrying Sykes, the court issued a peremptory writ of mandate directing dismissal of the charges against him. (*Id.* at pp. 94–95.)

42

We agree there is no indication the People had appealed the order granting Sykes habeas relief, but that fact was immaterial to the *Sykes* court's determination. As Bilbrey suggests, the effect of an appeal on the 60-day period was simply not before the court. Thus, *Sykes* lends no support to the People's contention that the 60-day provision does not apply when they have appealed an order granting habeas relief. (*People v. Jennings* (2010) 50 Cal.4th 616, 684 [" 'cases are not authority for propositions not considered' "].)

Rather, the import of *Sykes* was to make clear that a habeas petitioner has a constitutional speedy trial right that applies after a trial court has granted a new trial as relief on a petition for habeas corpus. *Sykes* recognized the right to a speedy trial as a fundamental right secured by the United States and California Constitutions, noting that it embodies a policy to expedite criminal proceedings "to the greatest degree that is consistent with the ends of justice." (*Sykes*, *supra*, 9 Cal.3d at p. 88.) As we have noted, the Legislature amended section 1382 in 1973 to expressly cover the situation addressed in *Sykes* by specifying the time limits on retrial "after the issuance of a writ or order which, in effect, grants a new trial." (5 Witkin, Cal. Crim. Law (4th ed. 2012) Criminal Trial, § 338, p. 568.)

Other than *Sykes*, the People cite no authority for the proposition that the 60-day statutory period was tolled by their habeas appeal. Given our preceding analysis of section 1506 and the fundamental nature of a criminal defendant's right to a speedy trial, we are not inclined to adopt such a position here. And there is another reason to reject the tolling argument, which concerns the language of section 1382. With respect to mistrials and orders granting new trials, if an appeal is not taken, *or if an appeal from such orders is taken*, subdivision (a)(2) provides that the 60-day time period shall run from the date "after the mistrial has been declared, after entry of the order granting the new trial, or *after the filing of the remittitur in the trial court*." (§ 1382, subd. (a)(2) [quoted in full in note 15, *ante*], italics added.) In addressing the "issuance of a writ or order which, in effect, grants a new trial," however, the statute makes no reference to an appeal being taken or to the filing of a remittitur, but specifies only that the time period

43

runs from the date "notice of the writ or order is filed in the trial court and served upon the prosecuting attorney." While the Legislature thus provided in effect that the appeal from a trial court order declaring a mistrial or granting new trial would toll the speedy trial period, it provided no such tolling in the case of an appeal from a grant of a writ. If it had intended to toll the speedy trial period for writs when it amended the statute to include them, it presumably would have employed language similar to that already contained in the statute in regard to mistrials and orders granting a new trial. (See *Kray Cabling Co. v. County of Contra Costa* (1995) 39 Cal.App.4th 1588, 1593 [" 'Where the same word or phrase might have been used in the same connection in different portions of a statute but a different word or phrase having different meaning is used instead, the construction employing that different meaning is to be favored' "].)

In the alternative, the People argue that their pending appeal in case No. A150273 constituted good cause to go beyond the 60-day statutory period. "What constitutes good cause for the delay of a criminal trial is a matter that lies within the discretion of the trial court. [Citations.] In reviewing trial courts' exercise of that discretion, the appellate courts have evolved certain general principles. The courts agree, for example, that delay caused by the conduct of the defendant constitutes good cause to deny his motion to dismiss. Delay for defendant's benefit also constitutes good cause. Finally, delay arising from unforeseen circumstances, such as the unexpected illness or unavailability of counsel or witnesses constitutes good cause to avoid dismissal. Delay attributable to the fault of the prosecution, on the other hand, does not constitute good cause. Neither does delay caused by improper court administration." (*People v. Johnson* (1980) 26 Cal.3d 557, 570, fns. omitted.)

In support of their good-cause argument, the People rely on cases in which courts considered whether an appeal may be valid justification for a delay in bringing a defendant to trial. (See *United States v. Loud Hawk* (1986) 474 U.S. 302; *People v. Superior Court (Arevalos)* (1996) 41 Cal.App.4th 908; *People v. Hernandez* (1985) 166 Cal.App.3d Supp. 1; and *Arnold v. Superior Court* (1971) 16 Cal.App.3d 984.) Some of these and other cases suggest that the People's pending appeal can constitute

good cause for delaying trial beyond the statutory period, or at least constitute a substantial factor in support of a good cause finding. (See *People v. Superior Court (Gonzales)* (1991) 228 Cal.App.3d 1588 [concluding dismissal of felony information under section 1382 was not warranted because the People had sought interlocutory appellate review of trial court's refusal to honor their peremptory challenge under section 170.6 of the Code of Civil Procedure]; *Marcotte v. Superior Court* (1976) 64 Cal.App.3d 235, 242 [concluding dismissal under section 1382 was not warranted because section 1538.5, subdivision (l) had automatically stayed trial and extended the section 1382 time period to allow the People to file a notice of appeal, noting "[a]ny other result would vitiate one of the underlying purposes of section 1538.5, which is to allow the People to seek appellate review of an adverse ruling on the admissibility of evidence"].)

But it was the People's burden to seek a stay by demonstrating good cause in a motion or application for a stay (*Batey v. Superior Court* (1977) 71 Cal.App.3d 952, 957) and to seek such relief prior to the expiration of the 60-day speedy trial deadline. Though the record reflects the trial court was aware of the People's pending appeal in case No. A150273, it also reflects the People did not provide the court with any authority supporting the proposition that their appeal justified the delay that would result from a stay. They argued only that forcing them to retry the case would deprive them of their remedy by way of appeal, which as we have already indicated is not accurate. (See pp. 39–40, *ante*.) If the People had sought a stay and demonstrated it would be burdensome to require them to retry the case, they were likely to succeed on appeal, and the burden on the People outweighed any possible prejudice to Bilbrey from delaying the retrial, the court might well have granted the stay. However, having failed to seek a stay pending appeal or to show good cause for a stay, the People have no basis for complaining that the statutory period for bringing the case to trial was not tolled, and as a result their further failure to bring the case to trial within the statutory period required the trial court to dismiss the case.

In short, we conclude that the People have not met their burden to show the trial court abused its discretion by dismissing Bilbrey's case under section 1502.

## DISPOSITION

The November 21, 2016 order granting Bilbrey's petition for writ of habeas corpus and the March 22, 2017 order granting Bilbrey's motion to dismiss are affirmed. Our May 2, 2017 stay of the dismissal order will dissolve upon issuance of the remittitur.

_____
STEWART, J.

We concur.



_____
KLINE, P.J.



_____
RICHMAN, J.



*People v. Bilbrey* (A150273, A151401)

Trial Court:   Solano County Superior Court

Trial Judges:  Hon. Paul L. Beeman, Hon. Allan P. Carter

Counsel:

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Laurence K. Sullivan, Supervising Deputy Attorney General, Michael Chamberlain, Bridget Billeter, Deputy Attorneys General, for Plaintiff and Appellant.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Respondent.